### HAUNSTEIN v. McCALISTER.

No. 23970. June 18, 1935.

614

Burney P. Bodard and F. E. Chappell, for plaintiff in error.

Embry, Johnson, Crowe & Tolbert, for defendant in error.

CORN, J. This action was brought in the district court of Garfield county by Levi McCalister, as plaintiff, against Paul R. Haunstein, defendant, for the recovery of the sum of $2.527.15. The plaintiff obtained judgment in the sum of $1,259.15, with interest at the rate of 6 per cent. per annum from January 30, 1932, from which the defendant appeals. The parties will be referred to herein as they appeared in the trial court.

This action arose out of a controversy between an attorney and his client over the above-mentioned sum of money, which the attorney, Paul R. Haunstein, claims was paid to him as a fee for legal services, while the client, Levi McCalister, contends that he placed the money in the hands of his attorney for the purpose of paying certain claims in a bankruptcy matter, and that Haunstein failed to apply the money to the payment of said claims. The parties did not have a written contract to show what the agreement was between them, and it seems that a detailed statement of the facts developed at the trial is essential to a proper understanding of the case. The facts as shown by the record are as follows:

In the year 1909, one Ella Hubbard obtained a judgment in the district court of Kingfisher county against the said Levi McCalister in the sum of $300 in a suit for damages for malicious prosecution. The judgment was kept alive, but McCalister successfully evaded payment of the same over a period of 20 years. The judgment creditor, in later years being a resident of Colorado, had placed the judgment in the hands of Brownlee & Blaine, attorneys at Kingfisher, for collection. Mr. T. R. Blaine had active charge of enforcing the same.

On July 31, 1929, Blaine had an execution issued on said judgment and placed in the hands of the sheriff of Kingfisher county, and George M. Hawks, deputy sheriff, went out to the Levi McCalister farm to levy upon property for the satisfaction of the judgment. McCalister claimed that the judgment was dormant and threatened the deputy sheriff with damage suit if he levied upon his property. However, he told the deputy sheriff that he would make an investigation of the judgment and if he found it to be a valid judgment, he would settle it. He was to report to the sheriff's office after the investigation was completed. McCalister went to his attorney, Lee Gray, at Hennessey and employed him to go to Kingfisher to examine the record and to ascertain whether or not the judgment was still in force. The examination was made and the attorney informed McCalister that the judgment was still in force and effect. McCalister, instead of reporting to the sheriff's office, counseled with Mr. Gray relative to taking bankruptcy to evade the payment of the judgment, and Gray advised against such a course. McCalister insisted on taking that course, and Gray, not desiring to represent him in said matter, suggested that he go to Enid and employ an attorney who was experienced in bankruptcy practice, and recommended Paul R. Haunstein as a capable attorney. Gray gave McCalister a set of bankruptcy blanks to be used in filing the case. Before going to Haunstein and without the knowledge of Gray, McCalister conveyed a property in Enid to his wife and his son, Mark E. McCalister, sent a bank draft for $178 to Mrs. Bell Blesh in California and transferred the balance of his bank account to his wife, and secreted some of his personal property.

On August 6th, he went to Haunstein's office in Enid and told him what he wanted to do and handed him the bankruptcy blanks which Gray had given him. Haunstein asked him why he did not have Gray handle the matter, and he told Haunstein that Gray was not taking bankruptcy cases, and that Gray had recommended him. This was the first time that McCalister and Haunstein had ever met. Haunstein pre-

pared the petition and schedules from the information given him by McCalister and had them signed and verified by McCalister and mailed them to the U. S. district clerk at Oklahoma City for filing on August 7, 1929. Just before this, however, the deputy sheriff had returned and levied on certain nonexempt personal property, inc.uding some hay, and on Saturday before the first meeting of the creditors at Guthrie, McCalister went to Haunstein's office and told him that he had left some hay out of the schedules, and that he had transferred the Enid property and had sent the money to the lady in California; that the Enid property belonged to his wife and son and that he had made the transfer in order that it might not be mixed up in the bankruptcy matter, and that the money sent to the lady in California was trust funds and that he transferred it for the same reason. He stated that he had forgotten to mention these matters when he made out his schedules. Haunstein told him that he would have the schedules amended to include the hay, and that the referee would require strict proof as to the Enid property and the trust funds.

Haunstein was delayed by rain and muddy roads and did not arrive at the hearing before the referee until T. R. Blaine, attorney for the judgment creditor. had commenced his examination of the bankrupt. In the examination McCalister's testimony was conflicting about how he received the money from his son, which he claimed went into the purchase of the Enid property. The referee, not being satisfied with the testimony, continued the hearing to a later date, appointed a trustee and ordered an investigation of McCalister's claims with reference to the trust property. Haunstein, not arriving in time to lay these matters before the referee, and the same being brought out in the examination of the bankrupt, was placed in an embarrassing position, and felt humiliated over what had transpired at the hearing. After the hearing he told McCalister that matters had become complicated and that due to the fact that they were practically strangers, he did not care to discuss the matter with him there, but thought they should have a meeting at Lee Gray's office at Hennessey and discuss the matter with Mr. Gray, who was his attorney. A short time afterwards they met at Gray's office, and Gray advised McCalister as to the seriousness of the situation and told him that he should be able

to prove his statements with reference to receiving the cash from his son to pay on the Enid property. Another hearing was to be had within the next few days, and McCalister's wife and daughter had been subpoenaed to appear as witnesses at said hearing.

In the meantime Blaine had talked to Gray about McCalister's conduct in the bankruptcy matter and told Gray that he had several criminal charges that could be filed against McCalister and that he intended to turn them over to the U. S. district attorney's office after he had collected his judgment. He also said that he believed Haunstein had conspired with McCalister to defraud the creditors, and left the inference that Haunstein should also be prosecuted. At that time Blaine did not know that Gray had any connection with the case. Gray told McCalister and Haunstein what Blaine had said about preferring criminal charges.

McCalister had first testified that his son, Mark, had shipped the money to him by express from Auburn, Neb., where his son worked in an express office, and then changed his testimony to the effect that his son had brought the money down and delivered it to him personally.

McCalister immediately went to Auburn, Neb., for a conference with his son, and while there wired back to Haunstein to ascertain the exact date his proof should show that the express receipt was issued. He returned in a day or two with an original canceled express receipt of proper date and a letter of same date from his son explaining that he had started to send the money by express, but had changed his mind and canceled the receipt, having decided to make the trip to visit his father, and that he would bring the money along when he came. The purpose of this evidence was to clear up his conflicting testimony before the referee and to furnish proof that his son's money was used in the purchase of the Enid property.

On his return home he stopped at Enid and went to Haunstein's residence early in the morning before Haunstein had got out of bed. They had breakfast and Haunstein looked over this evidence, and being dubious about the genuineness of the documents, told McCalister that they should drive down to Hennessey and go over the matter with Gray. They went to Gray's office that morning and Gray examined the

canceled express receipt and the letter. The ink had hardly dried on the letter, which was supposed to have been written several years before. Gray told McCalister that the receipt could not be used as evidence, as it appeared to be a forgery, and that the ink with which the letter was written was hardly dry; that such evidence would get him into serious trouble, and McCalister admitted they were forgeries. He also admitted that the Eliza Kerns note of $300, Alfred Killibrew note of $180, and the Mark E. McCalister note of $290, listed as debts against the bankrupt, were bogus, and that these parties were his relatives and that he had written the notes himself.

At this juncture Haunstein informed McCalister that he was withdrawing from the case and would not represent him any longer. McCalister insisted that Haunstein stay with him and get him out of his predicament and defend him against any criminal charges that might be filed against him. Haunstein told him that he would not represent him further in the matter; that he had already quit the case. However, the conversations continued further into the day, and the attorneys counseled together as to the proper procedure to get McCalister out of his difficulty, and decided that, since he did not owe anything but the Hubbard judgment and a small account to the Hennessey Motor Company, he should pay these claims and also get releases of the claims which he listed in favor of his relatives, and get a dismissal of the bankruptcy proceedings. At this time Haunstein told McCalister that he would get him out of bankruptcy and would defend any criminal prosecution that might be filed against him, but that he would do this only under one condition, and that was that McCalister should raise $3,500 and place it in Haunstein's hands, with which Haunstein was to pay off the Hubbard judgment, which amounted to $1,115, and was to retain the balance of the money as his fee for disposing of the bankruptcy matter and for degending McCalister against any criminal charges that might be filed against him growing out of the bankruptcy matter. McCalister agreed to this proposition and on the same day borrowed $3,500, giving a mortgage on his farm to secure the payment thereof, and turned the money over to Haunstein.

Haunstein went to Guthrie and told the referee in bankruptcy that McCalister had raised some money and would be able to settle the Hubbard claim and be able to get a release of the other claims, and asked him if the proceedings could be dismissed if this was done, and the referee consented to recommend the dismissal of the case upon proper showing that the creditors had been satisfied. Haunstein prepared waivers, and after McCalister had them executed by his relatives, presented and filed them in the bankruptcy proceedings. Haunstein gave Lee Gray $1,200 and had him take it to Blaine to settle the Hubbard judgment. The judgment, accrued interest, and costs amounted to $1,115, and Blaine refunded the balance to Gray, who sent it to Haunstein. The bankruptcy matter was dismissed January 3, 1930.

After McCalister had determined that no criminal charges were likely to be filed against him, he went to Haunstein and asked him to refund a part of the money, and Haunstein refused to make any adjustment. On June 10, 1931, McCalister filed suit for $2,527.15.

The main issue involved in this case was whether a new contract of employment was made between the parties. Plaintiff claimed that he turned this money over to defendant to be used in paying all claims listed in the bankruptcy matter and that the residue, if any, remaining after paying said claims was to have been returned to him. Defendant contended that a new contract of employment had been made between himse.f and the plaintiff by which the plaintiff was to place in his hand the sum of $3,500, and that out of this sum the defendant was to pay the Hubbard judgment, which amounted to $1,115, and the balance was to be retained by defendant as attorney's fee for closing the bankruptcy proceedings and for defending the threatened criminal prosecutions. The jury, by their verdict, decided the issue in favor of the defendant, as to the existence of the new contract, but awarded the plaintiff judgment for the sum of $1,259.15 instead of the sum prayed for in his petition.

The defendant, on appeal, complains of several errors committed by the trial court in the trial of the case. He complains that the court admitted certain evidence which was not within the issues of the case, and also that the court's instructions failed to properly present defendant's theory of the case.

We have considered the various propositions argued in defendant's brief, and it is obvious that certain errors complained of were committed at the trial of the case below, but, since the jury decided the case

in the main upon defendant's theory, and awarded the defendant a substantial fee for the services actually rendered, we deem it unnecessary to enter into a discussion of the errors complained of, as we are convinced from a careful study of the case that no substantial right of the defendant was prejudiced thereby, and that the case falls clearly within the harmless error rule.

Under section 3206, O. S. 1931, no judgment shall be set aside or new trial granted on the ground of misdirection of the jury or the improper admission or rejection of evidence or as to any error in the pleadings or procedure, unless in the opinion of the court, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

It is true that the jury did not allow the defendant the full amount of the fee claimed by him, and that is the basis of his complaint in this court. The jury evidently followed the court's instruction No. 4 in arriving at the amount awarded the defendant. This instruction as a whole embodies a fair statement of the law applicable to this case. It is as follows:

"You are instructed that as an affirmative defense herein, the defendant pleads and contends that the $3,500 was paid to and received by him on November 5, 1929, under a second and separate employment contract between the plaintiff and the defendant, whereby defendant alleges, it was agreed that the defendant was to first pay out of said money the principal, interest and costs of said Ella Hubbard judgment and the costs of said bankruptcy proceedings, and that the remainder was to be retained and kept by the defendant as a fee and compensation for the defendant for services thereafter rendered by defendant and said Lee Gray in representing plaintiff in any action, civil or criminal, arising out of said bankruptcy proceedings, and that said sum was reasonable compensation therefor. If you find from the evidence that at the time said second, separate and new contract is alleged to have been made, that the relation of attorney and client existed between plaintiff and defendant, then, in that event, you are instructed that the relationship between attorney and client, after same is established is of the very highest trust and confidence, and that any contract then made for the benefit of an attorney is constructively fraudulent, and the burden is upon the attorney to prove the making of the contract by a preponderance of the evidence and also to prove and show that the contract is fair, just and equitable; and if you find that the defendant, Haunstein, has proved by a preponderance of the evidence that the second and new contract was made by and between plaintiff and defendant as alleged by defendant, and that defendant has also proved by a preponderance of the evidence that said contract is fair, just and equitable, you will find for the defendant and award defendant reasonable compensation for services rendered after November 5, 1929, in addition to the services covered by said $150 fee paid the defendant to represent plaintiff in said bankruptcy proceedings, as may be shown by the evidence in the case and award judgment for the plaintiff for such sum, if any, as you may find from the evidence to be the difference between the amount retained by defendant after paying said judgment and costs and the amount, if any, you may find from the evidence would be reasonable compensation for any services you may find from the evidence the defendant has rendered under said contract since November 5, 1929, in addition to the services covered by said $150 fee paid the defendant to represent plaintiff in said bankruptcy proceedings. If you find that the defendant has failed to prove by a preponderance of the evidence that said new and second contract alleged to have been made on November 5, 1929, was made and entered into between the parties, as alleged by defendant, your verdict will be for the plaintiff, and you will award judgment for a sum equivalent to the difference between said $3,500 and said sums paid out by defendant in settlement of said Hubbard judgment and costs."

It is a well-established rule of law that contracts between attorney and client, to the advantage of the attorney, made while such relation exists, are presumptively fraudulent, and the burden of proof is upon the attorney to show that such contracts are fair, just, and equitable, and even then he is not entitled to recover more than reasonable compensation for his services, regardless of the contract price.

The relation of attorney and client existed between the parties at the time of making the new contract. The defendant cannot contend with much force that the pretended withdrawal from the case terminated the fiduciary relation when the defendant continued in the case for increased fee. A withdrawal by an attorney is not effectuated, nor is the fiduciary relation between attorney and client terminated, by a threat to withdraw, where the attorney continues in the case either under the original contract or under a new contract of employment.

The facts in this case justify a new contract providing for a better fee, as the original fee of $150 was based upon a simple bankruptcy matter and did not contemplate the complications which later arose by no fault of the defendant. The new fee agreed upon does not appear to be unreasonable for the services contemplated at the time of the agreement, but when it developed that no criminal charges were filed against the plaintiff, and there were no services to be rendered on that account, then, upon the refusal of the defendant to return a just portion of the fee, a cause of action arose in favor of the plaintiff and against the defendant for the unearned portion of the fee. Where a large fee is based upon such a contingency it is presumptively fraudulent, and whether the relation of attorney and client was established before or after the making of such a contract is immaterial.

In Tillman v. Gazaway et al., 128 Okla. 183, 261 P. 935, we find a case similar to the case at bar. That was an action to cancel a deed to 40 acres of land. Gazaway had been jointly charged with two companions with robbery. He employed a firm of attorneys to defend him, giving a bill of sale to an automobile and a deed to 40 acres of land. The county attorney decided to dismiss the case against Gazaway and use him as a witness against the other two defendants. The other two defendants pleaded guilty and no action was ever taken against Gazaway. The trial court entered judgment canceling the deed, and the judgment was affirmed on appeal.

In the opinion affirming said judgment this court commented on the question of fraud as follows:

"It is contended that the amount charged in this case is sufficient to show fraud, in that the same was unreasonable. We do not think the amount of the attorney's charge in this case was so unreasonable that it would in itself invalidate the contract and make void the deed. It clearly appears that Tillman performed all services necessary, and that the same were perfectly satisfactory. But, owing to the other facts and circumstances under which this contract was entered into, and remembering that the amount of the fee was between $1,500 and $3,000—this being all the property that the plaintiff owned—we believe the amount of the fee, together with the other facts and circumstances, is proper to be considered in determining whether or not fraud was actually practiced upon the plaintiff."

In the case of Redwine v. Cummins, 108 Okla. 39, 233 P. 418, a note of $500 was given Redwine for services to be performed in representing the defendants in a criminal case, provided they were indicted by the federal grand jury. The federal grand jury ignored the charges and the defendants were never indicted, and the plaintiff never performed the services for which the note was executed.

The defendants admitted they owed the plaintiff $50 for the services he had performed before the United States commissioner, but pleaded the balance of the note to be without consideration. The court held the defense to be good.

The defendant contends that the question of quantum meruit is not involved in this case; that the court erred in instructing the jury to award the defendant reasonable compensation for the services rendered if they found the new contract existed. The fact that some of the services for which the defendant had been paid were never performed naturally raised the question as to what was a reasonable compensation for the services actually rendered by the defendant.

There was a conflict in the evidence as to the purpose for which the $3,500 was given to the defendant, but the jury found from the preponderance of the evidence that the money was advanced to the defendant under the new contract as claimed by the defendant, but allowed the defendant only a reasonable compensation for the services actually rendered.

In an action at law, where a general verdict has been rendered and judgment rendered on the verdict, and the evidence is conflicting, and there is competent evidence to sustain the verdict, the Supreme Court will not weigh the evidence, but will sustain the verdict of the jury.

The judgment of the trial court is affirmed.

McNEILL, C. J., OSBORN, V. C. J., and RILEY BAYLESS, BUSBY, PHELPS, and GIBSON, JJ., concur. WELCH, J., absent.